IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| WILLIAM WERNER, | : | Case No. 1:16-cv-800 |
| | : | |
| Plaintiff, | : | Judge Michael R. Barrett |
| | : | |
| v. | : | **ORDER GRANTING DEFENDANTS'** |
| | : | **MOTIONS FOR SUMMARY** |
| FORD MOTOR COMPANY, et al., | : | **JUDGMENT** |
| | : | |
| Defendants. | : | |

This matter is before the Court on the Motions of Defendants Ford Motor Company and

International Union, United Automobile, Aerospace, and Agricultural Implement Workers of

America Local 863 ("the Union" or "UAW") for Summary Judgment (Docs. 19 and 20).  In this

hybrid breach of contract/breach of duty of fair representation case, Plaintiff William Werner

alleges that Defendant Ford Motor Company breached the applicable Collective Bargaining

Agreement ("CBA") by failing to follow required procedures before "de-selecting" him from a

Team Leader position.  Werner alleges that the Union breached its duty of fair representation

when it withdrew the grievance at the second stage of the grievance procedure rather than

pursuing his grievance through arbitration.  He opposes both Motions for Summary Judgment

(Doc. 29).  For the reasons set forth below, Defendants' Motions for Summary Judgment (Docs.

19 and 20) will be **GRANTED**.

## I.  BACKGROUND

### A.  Facts

In 1998, Defendant Ford Motor Company ("Ford") hired Plaintiff William Werner as a

manufacturing technician at its Sharonville, Ohio transmission plant.  From August 2012 to

October 2015, Plaintiff held a Team Leader position.[1]  As Team Leader, Werner headed a work group of seven hourly employees, for which he earned an additional $1.50 per hour.

Following a brief probationary period, Werner became a member of the Union in early 1999.  He has remained a member of the Union continuously since that time.  As a Union member, Werner's employment is governed in relevant part by the collective bargaining agreement ("CBA") between Ford and the Union.

Pursuant to the CBA section entitled "Team Leader De-selection Process:"

> During the 2011 negotiations there were considerable discussions regarding a new de-selection process for Team Leaders.  At the time of this agreement, a standard for de-selection was not yet promulgated by the national parties and the timing of any pending implementation was uncertain.
>
> However, the following process shall serve until such time that a new standard is established and effectively implemented at the Sharonville Plant:
> - The de-selection process can be initiated by Management, the Union or the Work Group.
> - A concern with the performance of a Team Leader may be communicated to the Joint ERC[2] Committee. The Joint ERC Committee will review the concern(s) and if they deem it appropriate, they will initiate the Involuntary Team Leader De-selection Survey to the Work Group Team, Management and the Team Leader within 7 business days.
> - The Joint ERC Committee and a Fresh Eyes Team will develop an action plan with specific timing (not to exceed 30 days).
> - At the conclusion of the action plan the Joint ERC Committee will re-survey the Work Group Team, Management and the Team Leader.

(2011–2015 CBA at 90, Doc. 19-1 at PageID 346 (footnote added).)

---

[1] Werner also served as Team Leader from December 2006 to May 2010, but that tenure is not part of this action.
[2] "ERC" is an acronym for Employee Resource Coordinator.  (Doc. 19-1 at PageID 140.)  A Joint ERC Committee includes representatives from Ford management as well as from the Union.

2

On June 17, 2015, a Union committeeperson informed the Joint ERC Committee that Werner's work group wanted to initiate a de-selection process.  According to Werner, one or two of his team members became disgruntled when he refused to let a large batch of poor quality parts pass rather than insisting they do their jobs properly.  (Werner Dep., Doc. 19-1 at PageID 133–34.)  The Joint ERC Committee at that time consisted of Ford management representative Martha Mehl and Union officials Otis Andrews and Michael Jeremy Cornett.

Once the Joint ERC Committee is notified, a member of the Joint ERC Committee attends the next team meeting to do a "lay of the land."  (Cornett Dep. Vol. II, Doc. 19-5 at PageID 655.)  The ERC that attended the team meeting then meets with the other Joint ERC Committee members to discuss the team's issues and determine whether they should initiate a de-selection survey.  Following the June 17, 2015 notification, ERC Otis Andrews attended the next meeting of Werner's team and emailed Mehl and Cornett on June 22, 2015.  (*Id.* at PageID 660–61.)  All three members of the Joint ERC Committee discussed the team's issues and decided not to initiate surveys on Werner.  (*Id.* at PageID 660.)

However, on July 21, 2015, a Union committeeperson again notified the Joint ERC Committee that Werner's team wanted to initiate de-selection.  The team reiterated essentially the same issues in this second request for de-selection as it had a month earlier.  It is "unusual" for a team to make a second de-selection request in such a short period of time.  (*Id.* at PageID 663.)  Indeed, ERC Martha Mehl had not seen it happen before.  (Mehl Dep., Doc. 19-4 at PageID 572.)

Within two days of the July 21, 2015 notification, ERC Cornett conducted the "lay of the land" meeting with Werner's team, met with the other Joint ERC Committee members, and

determined they should initiate de-selection surveys on Werner.  (*Id.* at PageID 583–86.)  ERC Mehl then notified all relevant parties that the initial surveys would be conducted at an upcoming weekly team meeting.  (*Id.* at PageID 586–88.)

On or about August 19, 2015, Werner received the action plan prepared for him pursuant to the CBA.  (Doc. 19-1 at PageID 142.)  The action plan indicated that the second de-selection surveys would be conducted September 30, 2015.  (*Id.* at PageID 143–44.)

As part of the action plan, Werner's Process Coach was supposed to immediately facilitate a series of dialogues between Werner and his team members individually so Werner could understand the issues and "[d]rive for common ground and understanding."  (Action Plan, Doc. 25-1 at PageID 1168.)  In addition, the action plan required the Process Coach "to conduct reviews with [Werner] several times a week to ensure implementation of this Action Plan and to coach [Werner] on his Leadership performance."  (*Id.*)  According to Werner, though, the individual meetings did not occur until "just a few days before" the second round of de-selection surveys, thereby limiting his time to demonstrate improvement.  (Doc. 19-1 at PageID 152.)  In addition, Werner's Process Coach never conducted the regular meetings to review and coach him on his leadership performance.  (*Id.* at PageID 246–47.)

The second involuntary de-selection surveys were administered, as scheduled, on September 30, 2015.[3]  Mehl then informed Werner he was de-selected as Team Leader, effective October 12, 2015.  (Doc. 19-1 at PageID 161–62.)  Although Ford de-selected Werner from the

---

[3] Werner alleges that some of his team members intentionally scored him inappropriately low on his second de-selection surveys, regardless of his performance.  (Doc. 29 at PageID 1327–28.)  At least one of his team members agrees with him, stating, "This amounts to a mob mentality, driven to hurt a good man just because he may ask people to take a little pride in their work, and perform at an expected level without intentionally slowing production (to create an unjustified need for weekend overtime hours).  It is shameful."  (Involuntary Team Leader De-Selection Survey, Doc. 28-1 at PageID 1318.)

Team Leader position, he remains employed as a manufacturing tech at the Sharonville plant. (*Id.* at PageID 110–12.)

On October 14, 2015, Werner filed a grievance protesting his de-selection as Team Leader. (*Id.* at PageID 165.) Werner orally stated his grievance to a Union representative and signed a blank grievance form. A Union representative physically completed the grievance form for Werner. (*Id.* at PageID 166–68.) In at least one other instance, Werner had signed a blank grievance form and allowed the Union to complete it and file it for him. (*Id.* at PageID 170.)

Werner's grievance was denied at both the first and second stages. (*Id.* at PageID 170–71.) Werner wanted his grievance appealed to the next stage, arbitration, but he was told the Union withdrew the grievance because Ford followed the required process in de-selecting him.[4] (*Id.* at PageID 171.) Werner did not know that he could appeal the Union's decision to withdraw the grievance. (*Id.* at PageID 171–72.)

When Werner asked his Union bargaining representative, Robert Abner, about his grievance,[5] Abner became annoyed that Werner requested "something in writing about the denial." (Doc. 29-1 at PageID 1339.) Abner indicated that "it was hard to fight, because . . . [t]hey went through the process." (*Id.* at PageID 1341.) Werner indicated that Ford did not follow the process correctly, but Abner responded, "You can always talk to Dave on that too . . .

---

[4] The Union determined that the proper process had been followed merely by asking ERC Cornett if the process was followed. (Abner Dep., Doc. 19-7 at PageID 774.) Cornett confirmed that he had followed the required process. (*Id.*)

[5] As an attachment to his Response to Defendants' Motions for Summary Judgment, Werner filed a Declaration purporting to attach a transcript of a conversation he secretly recorded between himself and his Union bargaining representative, Robert Abner. (Doc. 29-1; Doc. 19-1 at PageID 96–98.) Both his Declaration and the transcription of the alleged recording indicate that the conversation occurred on February 8, 2015. (Doc. 29-1 at PageID 1339, 1341.) Because Ford did not de-select Werner from the Team Leader position until October 2015, the Court will assume—for purposes of this Order only—that Werner intended to date the Declaration and alleged transcription February 8, 2016.

Again just to give you an avenue." (*Id.* at PageID 1341–42.)  Werner asked no other follow up

questions.  "Dave" refers to Dave Mason, the Chairman of Werner's local Union.  (*Id.* at PageID

1340.)  According to Werner, Mason "was in Detroit at the time, and I never saw him after my

conversation with Mr. Abner." (*Id.*)  Werner further declares, "I did not appeal the withdrawal

of my grievance within my Union because Mr. Abner did not inform me that I could, and

because he led me to believe that the only avenue I could pursue at that point was to talk to Dave

Mason." (*Id.*)

### B.  Procedural Posture

Plaintiff initiated this action pursuant to § 301 of the Labor-Management Relations Act,

29 U.S.C. § 185.  Werner alleges that Ford breached the CBA between Ford and the Union by

deselecting him from the Team Leader position without following the required procedure.  He

alleges that the Union breached its duty of fair representation to him by withdrawing the

grievance at the second stage of the grievance procedure rather than pursuing it through

arbitration.  Defendants move for summary judgment on all claims contending that Werner failed

to exhaust his internal Union remedies before initiating this action, that Ford did not violate the

CBA, and that the Union provided good faith representation to Werner.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary

judgment is appropriate if "there is no genuine issue as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the burden to

show that no genuine issues of material fact are in dispute.  *See Matsushita Elec. Indus. Co., Ltd.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d

806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

### III.    ANALYSIS

#### A.  Hybrid Claims under Section 301

In hybrid cases, like this one, a plaintiff sues the employer for violation of the CBA and sues the union for breaching its duty of fair representation.  As these two claims are "inextricably interdependent," an "employee must prove both claims to recover from either defendant." *Chapman v. United Auto Workers Local 1005*, 670 F.3d 677, 682 (6th Cir. 2012) (*en banc*); *see also Caimona v. Ohio Civil Serv. Emp. Ass'n, AFSCME Local 11*, 814 F. App'x 130 (6th Cir. July 27, 2020) (citing *Chapman*, 670 F.3d at 683).

#### B.  Failure to Exhaust Required Internal Remedies

National labor policy "encourages private rather than judicial resolution of disputes arising over collective-bargaining agreements."  *Clayton v. Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am.,* 451 U.S. 679, 689, 101 S.Ct. 2088, 2095 (1981).  Thus, "Before suing his union in federal court, a plaintiff alleging breach of the duty of fair representation in processing a grievance must first undertake and exhaust internal union remedies."  *Pearson v. United Auto. Workers Int'l Union*, 694 F. App'x 401, 403 (6th Cir. 2017).  There are three exceptions to this general rule:

> (1) if union officials are so hostile that the plaintiff has no hope of a fair hearing; (2) if the internal union appeals procedures are inadequate either to reactivate the plaintiff's grievance or to award him the full relief he seeks; or (3) if internal procedures would unreasonably delay the plaintiff's opportunity to obtain a judicial hearing on the merits.

*Id.*; *see also Spicer v. Ford Motor Co.*, 491 F. App'x 543, 545 (6th Cir. 2012).  The plaintiff bears the burden of establishing that one of these exceptions applies.  *Id.*  Otherwise, his failure

8

to exhaust internal union remedies bars him from suing both the union and the employer.

*Chapman*, 670 F.3d at 685.

In the case at bar, Werner admits that he did not exhaust the internal Union remedies. The Union appeals process is contained in Article 33 of the UAW's constitution.  Rather than attempting to demonstrate one of the established exceptions, though, Werner argues that the Court should excuse his failure to exhaust internal union remedies because:  (1) he did not know that he could appeal as he was not made aware that the UAW's constitution was available online (Doc. 19-1 at PageID 171–72; Doc, 29 at PageID 1331); (2) the Union appeals process is not fair or reasonable because the UAW's constitution and the Union's local by-laws are lengthy, vague, and confusing (Doc. 29 at PageID 1332–33, 1337); and (3) "the Union is equitably estopped from asserting that Plaintiff had a duty to exhaust internal union remedies" because Abner, the Union's bargaining representative, "led Plaintiff to believe that the only 'avenue' he could pursue (after the Union withdrew his grievance) was to 'talk to Dave [Mason],' the Chairman of the Local."  (Doc. 29 at PageID 1337.)  The Court will address each of these contentions in turn.

First, "Simple ignorance is no excuse for failure to exhaust."  *Rogers v. Bd. of Educ.*, 2 F.3d 163, 167 (6th Cir. 1993); *Young v. Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am., Local 651*, 686 F. App'x 304, 308 (6th Cir. 2017) (quoting *Rogers*). The UAW's constitution "is a written document, which [Plaintiff] should have reviewed to ascertain [his] rights."  *Young*, 686 F. App'x at 308 (quoting *Rogers*, 2 F.3d at 167).  "Union members . . .  have an affirmative duty to educate themselves about the available internal procedures."  *Id.* (quoting *Hammer v. Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am.*, 178 F.3d 856, 858 (7th Cir. 1999)).  Thus, ignorance of the UAW's internal

appeals process "is no excuse for . . . failure to comply with [its] requirements."  *Id.* (quoting *Burneson v. Thistledown, Inc.*, No. 06-3948, 2007 WL 1339839, at *3 (6th Cir. May 7, 2007)) (alteration in original).

Second, Article 33 of the UAW's constitution—the very appeals process Werner challenges here—has been evaluated repeatedly and uniformly enforced.  *See, e.g., Young v. Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am., Local 651*, 686 F. App'x 304 (6th Cir. 2017); *Chapman v. United Auto Workers Local 1005*, 670 F.3d 677 (6th Cir. 2012) (*en banc*); *Spicer v. Ford Motor Co.*, 491 F. App'x 543 (6th Cir. 2012).  In addition, although Plaintiff's Memorandum contends that the UAW's appeals process is "hopelessly confusing and ambiguous," Werner himself testified that he did not appeal the Union's grievance withdrawal because he "didn't know [he] could."  (Doc. 29 at PageID 1337; Doc. 19-1 at PageID 171–72.)  Werner has submitted no evidence whatsoever that he ever attempted to review the UAW's constitution or local bylaws or that he found the procedures too confusing or ambiguous to follow.

Finally, as to Werner's contention that his recorded conversation with union bargaining representative Abner should equitably estop the Union from raising the exhaustion requirement, "It is well-settled that the opinion of a union representative cannot be construed as a waiver of the UAW's constitutional appeal requirements."  *Chapman*, 670 F.3d at 685 (quoting *Ryan v. Gen. Motors Corp.*, 929 F.2d 1105, 1110 (6th Cir. 1989)).  In *Chapman*, the UAW shop chairman specifically informed Chapman in writing that another union representative had "messed it up," that Chapman's situation "should never have happened," and that he "had no case to pursue."  *Id.* at 680.  The Sixth Circuit Court of Appeals, in an *en banc* decision,

concluded that Chapman could have and should have appealed the union's failure to act through the union's internal appeals process. Because he failed to do so, "Chapman's hybrid § 301/fair representation suit is barred for failure to exhaust internal union remedies." *Id.* at 686.

In the case at bar, Abner informed Werner only that his grievance had been withdrawn because Ford "went through the process" and that Werner "can always talk to Dave [Mason, local union chairman] on that too . . . just to give you an avenue." (Doc. 29-1 at PageID 1341–42.) Abner did not tell Werner he had no recourse for the Union's decision, and, even if he had, Abner's statement would not relieve Werner of his obligation to avail himself of the Union's appeals process. Accordingly, as in *Chapman*, Werner's hybrid § 301/fair representation suit is barred for failure to exhaust internal union remedies.

### C. Stay Instead of Summary Judgment

Werner argues, without citation to authority, that the Court should exercise its discretion to stay this action to permit him to pursue the Union's prescribed appeals process out of time rather than enter summary judgment in favor of Defendants. (Doc. 29 at PageID 1337–38.) The Court declines to do so. As explained above, unless one of the exceptions to the general rule requiring exhaustion applies, failure to exhaust internal union remedies bars a hybrid § 301/fair representation action.[6]

---

[6] The Court notes that it located one case in which a District Court was ordered to hold a hybrid § 301/fair representation case in abeyance while the employees pursued their internal union appeals, *Slight v. Local 12, Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am.,* 726 F. App'x 469 (6th Cir. 2018). However, that case involved an unusual fact scenario not relevant here. In *Slight*, union officials did not inform the employees that their grievance had been withdrawn until 10 months after the time to appeal the withdrawal had expired. In addition, when the employees attempted to pursue the union's internal appeals process, they were specifically told that "it's too late to file an appeal," and to "get a lawyer" instead. *Id.* at 472. In the case at bar, the union official told Werner to "talk to Dave [Mason, local union chairman] on that." (Doc. 29-1 at PageID 1341–42.) Unlike the employees in *Slight*, Werner made no effort to discuss the matter with Mason or other higher ranking union officials, to educate himself on his rights under the Union bylaws or the UAW's constitution, or to pursue any further internal Union remedies before filing the instant action.

11

**IV.    CONCLUSION**

For the foregoing reasons, the Defendants' Motions for Summary Judgment (Docs. 19

and 20) are hereby **GRANTED.**  This matter shall be terminated from the Court's docket.

**IT IS SO ORDERED**.

Dated: 8/25/2020              S/Michael R. Barrett_____
                             Judge Michael R. Barrett
                             United States District Court